**United States District Court**

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SANDRA BREBER,

        Plaintiff,

  v.

ARTHUR ANDERSEN LLP GROUP
ACCIDENT AND HEALTH INSURANCE
PLAN,

        Defendant.

                              /

No. C 05-03294 JSW

**ORDER DENYING CROSS-
MOTIONS FOR SUMMARY
JUDGMENT**

      Now before the Court are the cross-motions for summary judgment filed by plaintiff Sandra Breber ("Plaintiff") and defendant Arthur Andersen LLP Group Accident and Health Insurance Plan ("Defendant" or "the Plan").  Having carefully reviewed the parties' papers, considered their arguments and the relevant legal authority,  the Court hereby denies both parties' motions.

**BACKGROUND**

      This action arises from the denial of Plaintiff's claim for benefits under the Plan.  Plaintiff brought this action to challenge the denial of her claim for disability benefits under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

      Plaintiff worked for Arthur Anderson LLP for approximately 22 years.  The parties dispute whether Plaintiff became disabled while she was covered by the Plan, and if so, what position Plaintiff held at Arthur Anderson at that time.

**United States District Court**

For the Northern District of California

1    On April 1, 2002, Plaintiff hit her head in a skiing accident.  Immediately after the

2   accident, Plaintiff was stunned, but not overtly confused or unconscious.  (Aetna 450.)  Soon

3   thereafter, she felt "woozy" and nauseated and had headaches.  She eventually developed fatigue

4   and slowed information processing.  Plaintiff also suffered from vertigo.  (*Id*.; *see also* Aetna

5   453.)  She was "quite ill" for the first couple of weeks after the accident and stayed in bed.  (*Id*.)

6   During the first four weeks after her accident, significant nausea limited her ability to carry on

7   daily and work activities.  She tried during this time to work a few hours from home, but found

8   this difficult.  (Aetna 453.)  On April 29, 2002, Dr. Bradley Wrubel, to whom Plaintiff was

9   referred for a neurologic consultation, wrote that Plaintiff has not been working since the

10   accident and likely would not go back to work for several more weeks.  (Aetna 455.)

11    Plaintiff's symptoms lingered and on June 5, 2002, Plaintiff was seen by Dr. Yuen T. So

12   for another neurological consultation.  (Aetna 451.)  Dr. So stated that her symptoms were

13   severe in the first month after the accident, but had become tolerable and intermittent in the

14   second month.  Dr. So reported that "[s]he tried to work through all of this initially, but about

15   two weeks ago has stopped and taken a disability leave."  (*Id*.)

16    By July 12, 2002, Plaintiff had improved 70 to 80 %.  (Aetna 450.)  Plaintiff had a CT

17   scan which was normal.  Doctors found no abnormalities upon a physical examination.  (*Id*.; *see*

18   *also* Aetna 453-54.)

19    Dr. Raskin diagnosed Plaintiffs as "post concussional," and opined that, based on her

20   rate of improvement, she was likely to be asymptomatic within a year.  (Aetna 450; *see also*

21   Aetna 452, 454, 642.)  Dr. Raskin noted that her condition was somewhat complicated by the

22   migraines Plaintiff had developed at the age of 40.  Her head injury had activated her migraines.

23   (Aetna 450.)

24    As her symptoms from the post-concussive syndrome improved, Plaintiff developed

25   additional medical problems.  In early August 2002, Plaintiff was examined by Dr. Jonathan P.

26   Terdiman in the UCSF Mt. Zion Gastroenterology Facult Practice.  (Aetna 447.)  Plaintiff had

27   symptoms suggestive of gastroesophageal reflux disease.  Possibly as a result of taking large

28   doses of Advil due to her post-concussive syndrome, Plaintiff "developed worsening of

2

United States District Court

For the Northern District of California

1    epigastric discomfort, as well as substernal buring, regurgitation of acid in her throat, and chest

2    pain." (*Id.*)  Plaintiff stopped taking Advil, but these symptoms continued. (*Id.*)  Due to her

3    symptoms, Plaintiff could not sleep at night. (*Id.*)  Dr. Terdiman found her symptoms were

4    "suspicious for gastroesophageal reflux disease," but noted that she was not responding to

5    medications for this condition.  (*Id.*)

6            Plaintiff went to the emergency room in August 2002 due to her severe abdominal pain.

7    (Aetna 649.)  Plaintiff explained that between August and December of 2002, her abdominal

8    pain "became persistently worse and by December 2002 was no longer intermittent but had

9    become constant."  (Aetna 650)  According to Plaintiff's husband, Manny Krakaris, Plaintiff's

10   abdominal pain became increasingly more intense during the summer and fall of 2002.  (Aetna

11   660.)  He testified that "During the summer and fall of 2002, [Plaintiff] had a very difficult time

12   with may of the things that she had taken for granted prior thereto. ... She was unable to

13   participate in any of the sports she had loved.  She would need to rest for extended periods

14   during the day ... ."  (*Id.*)

15          On December 10, 2002, Plaintiff had an ultrasound.  (Aetna 332-33.)  On December 18

16   and 20, 2002, Dr. David H. Watts ran several tests on Plaintiff's blood.  (Aetna 419-20.)  On

17   December 23, 2002, Plaintiff was still experiencing abdominal pain and Dr. Watts conducted an

18   endoscopy.  The endoscopy did not reveal any pathologic abnormality.  (Aetna 415-16.)  On the

19   same day, Dr. Watts also tested Plaintiff for pancreatitis by conducting a CT scan of her

20   abdomen and pelvis, which revealed no evidence of acute pancreatitis and was otherwise

21   unremarkable.  (Aetna 417-18.)

22          Due to her pain, Plaintiff went to the emergency room again on December 24, 2002,

23   Christmas Eve.  (Aetna 074, 650, 660.)  On December 30, 2002, a doctor noted that Plaintiff's

24   endometriosis, which she previously suffered from last in 1987, had reoccurred.  (Aetna 552.)

25          On January 29, 2003, Dr. James R. Sakamoto performed an exploratory and therapeutic

26   laparoscopy on Plaintiff.  (Aetna 439, 442.)  Dr. Sakamoto's preoperative diagnosis was:

27   "[i]ncreasing lower abdominal pain, history of extensive endometriosis, presumptive recurrent

28   endometriosis."  (Aetna 442.)  After the laparascopy, Dr. Sakamoto diagnosed Plaintiff as: "[n]o

3

**United States District Court**

For the Northern District of California

1    evidence of active endometriosis, dense adhesion, rectosigmoid, posterior lower segment, with

2    possible endometriosis.  Dr. Sakamoto identified a fine adhesion to the right ovarian fossa and a

3    fairly dense adhesion in her cul-de-sac area.  He further noted whitish nodules possibly

4    consistent with endometrial implants.  (Aetna 442.)  However, Dr. Sakamoto later described his

5    findings as "no specific evidence of endometriosis."  (Aetna 439.)  During the procedure in

6    January 2003, Dr. Sakamoto lysed the adhesions and fulgurated the possible areas of

7    endometriosis.  (Aetna 439.)

8          After the surgery in January 2003, Plaintiff was placed on continuous oral contraceptive

9    suppression and experienced some improvement.  (Aetna 316.)  As of mid-February 2003, Dr.

10   Sakamoto found that Plaintiff was recovering slowly from the surgery, but was steadily

11   improving, and anticipated that she would be able to return to her usual work activities

12   approximately four weeks after the surgery.  (Aetna 074.)  However on March 5, 2003, Dr.

13   Watts noted that she was in continuous abdominal pain and would need an additional six weeks

14   of recovery time.  (Aetna 411.)   Notes from a doctor indicate that Plaintiff was experiencing

15   "bloating and pain" and that her pain felt like a "stitch in one side."  (Aetna 412.)

16         In April, May and June 2003, Plaintiff experienced break through bleeding and

17   continued abdominal pain. (Aetna 508, 650.)  Plaintiff provided the following description of her

18   condition: "By June 2003 I was all tied up again inside.  I was unable to stand for more than 30

19   minutes at a time. ... Frequently I was doubled over in pain and would just stay in bed all day."

20   (Aetna 650.)

21         On August 18, 2003, Plaintiff had a total abdominal hysterectomy for "worsening lower

22   abdominal and pelvic pain and presumptive endometriosis."  (Aetna 439, 495.)  Dr. Sakamoto's

23   pre- and post-operative diagnosis was "increasing pelvic and lower abdominal pain."  (Aetna

24   495.)  Before the surgery, he diagnosed her with "severe pelvic endometriosis."  After the

25   surgery, he refined his diagnosis to be "severe pelvic endometriosis plus cul-de-sac scarring and

26   endometriosis."  (*Id.*)  He found filmy adhesions on her right fallopian tup and ovary, filmy

27   dense adhesions "obliterating the cul-de-sac," and small power burns consistent with

28   endometriosis.  (*Id.*)

4

1    On the forms submitted to Defendant for Plaintiff's claim, Dr. Kurt Wharton stated that

2   Plaintiff suffered from endometriosis and had symptoms such as vasomotor depression,

3   migraine headaches, musculoskeletal pain, pelvic pain, insomnia, decreased cognition, agitation,

4   and diffuse neuropathies starting in August 2002.  (Aetna 183.)  Dr. Wharton further stated she

5   was under medical restrictions such as "enforced rest each day" and that he prescribed these

6   work restrictions in December 2002.  (Aetna 184.)

7    The Court will address the additional specific facts as required in the analysis.

8                                    **ANALYSIS**

9   **A.     Legal Standard on Summary Judgment.**

10   A principal purpose of the summary judgment procedure is to identify and dispose of

11   factually unsupported claims.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).

12   Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and

13   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

14   any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

15   Civ. P. 56(c).

16   A party moving for summary judgment who does not have the ultimate burden of

17   persuasion at trial, must produce evidence which either negates an essential element of the non-

18   moving party's claims or show that the non-moving party does not have enough evidence of an

19   essential element to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins.*

20   *Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  A party who moves for summary

21   judgment who does bear the burden of proof at trial, must produce evidence that would entitle

22   him or her to a directed verdict if the evidence went uncontroverted at trial.  *C.A.R. Transp.*

23   *Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

24   Once the moving party meets his or her initial burden, the non-moving party must go

25   beyond the pleadings and by its own evidence "set forth specific facts showing that there is a

26   genuine issue for trial."  Fed. R. Civ. P. 56(e).  In order to make this showing, the non-moving

27   party must "identify with reasonable particularity the evidence that precludes summary

28   judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  It is not the Court's task to

**United States District Court**

For the Northern District of California

1    "scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v.*

2    *Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).  If the non-moving party fails to make

3    this showing, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at

4    323.

5         An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact

6    finder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

7    (1986).  A fact is "material" if it may affect the outcome of the case.  *Id.* at 248.  "In considering

8    a motion for summary judgment, the court may not weigh the evidence or make credibility

9    determinations, and is required to draw all inferences in a light most favorable to the non-

10   moving party."  *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

11   **B.    Cross-Motions for Summary Judgment**

12        ERISA allows a participant in an employee benefit scheme to bring a civil action to

13   recover benefits due under the terms of a plan.  29 U.S.C. § 1132(a)(1)(B).  Courts review a

14   denial of benefits challenged under § 1132(a)(1)(B) "under a *de novo* standard unless the benefit

15   plan gives the administrator or fiduciary discretionary authority to determine eligibility for

16   benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S.

17   101, 115 (1989).  Here, the parties have stipulated that the Court should review the denial of

18   benefits *de novo*.  Under the *de novo* standard, "in considering motions for summary judgment,

19   the district court must decide whether there are genuine issues of material fact, not whether there

20   was substantial or ample evidence to support the plan administrator's decision."  *Mongeluzo v.*

21   *Baxter Travenol Disability Benefit Plan,* 46 F.3d 938, 942 (9th Cir.1995).  Here, there are

22   questions of fact regarding when Plaintiff when Plaintiff became disabled.

23        **1.    Plaintiff's Disability.**

24        The parties do not dispute that as of August 2003, Plaintiff was disabled by surgically

25   induced menopause and continued to be disabled until October 31, 2005.  What is in dispute is

26   whether Plaintiff was disabled starting in 2002.

27        In April 2002, Plaintiff hit her head in a skiing accident.  (Aetna 450.)  Plaintiff contends

28   that from April through August 2002, she suffered from post-concussive syndrom and that she

*United States District Court*

*For the Northern District of California*

6

1  was not working during this time period due to this condition.[1]  Plaintiff further contends that as

2  she recovered from the post-concussive syndrome, she started developing severe abdominal pain

3  which her doctors later diagnosed as a reoccurrence of endometriosis.  According to Plaintiff,

4  she was in disabling pain from August 2002 through August 2003 due to endometriosis, and

5  thus could not work.

6        On Plaintiff's claim for long-term disability benefits, she stated that the first day of work

7  she missed due to her alleged disability was December 23, 2002.  (Aetna 382.)  While Plaintiff

8  argues that she was mistaken when she wrote this date and that she actually stopped working on

9  April 1, 2002, her claim form creates a question of fact regarding when she last worked due to

10  her alleged disability and whether she was continuously disabled prior to December 23, 2002.

11        With respect to whether Plaintiff was suffering from endometriosis from the summer of

12  2002 through August 2003, Defendant points to the Dr. Sakamoto's findings of "no specific

13  evidence of endometriosis" after he conducted a laparoscopy on Plaintiff on January 29, 2003.

14  (Aetna 439.)  This evidence creates a question of material fact regarding whether Plaintiff was

15  disabled from endometriosis from sometime in 2002 through August 2003.  Accordingly, the

16  Court denies Plaintiff's motion for summary judgment.

17        On the issue of whether Plaintiff was disabled in 2002, the Court cannot find in

18  Defendant's favor as a matter of law either.  Plaintiff presents evidence from which a reasonable

19  juror could find that she was disabled in 2002 through August 2003.  Accordingly, the Court

20  denies Defendant's motion for summary judgment on this ground.

21      **2.**    **Notice-Prejudice Rule.**

22        Defendant argues that regardless of when Plaintiff last work or when Plaintiff became

23  disabled, even it was before August 2003, Plaintiff is barred from recovering benefits because

24  she waited too long to file her claim for benefits.  Under California law, an insurer may raise the

25  insured's failure to give timely notice of a claim as a defense, but to do so, the insurer must

26

27  [1] At the hearing, Plaintiff's counsel represented that Plaintiff received short-term
disability benefits in the spring of 2002 when she suffered from post-concussive syndrome.
If true, evidence of her receipt of such benefits would be probative as to whether Plaintiff was

28  working during that time or whether she was suffering from an injury which interfered with
her ability to work, at least in the short term.

United States District Court

For the Northern District of California

prove that the claim was late and that it suffered substantial prejudice. *Cineros v. UNUM Life Ins. Co. of Amer.*, 134 F.3d 939, 944 (9th Cir. 1998) (*citing Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 760 (1993)); *see also O'Neil v. Fireman's Fund Amer. Retirement*, 2005 WL 1562799, * 5 (N.D. Cal. June 22, 2005) (holding that to prevail under notice-prejudice rule, insurer must show: "(1) the claimant failed to submit timely proof of claim, and (2) the delay actually caused the insurer substantial prejudice.").

Here, Defendant has not demonstrated that Plaintiff submitted her claim late. To establish the deadline for filing claims, Defendant points to the summary plan descriptions, which provide that an applicant for long-term disability benefits should "contact the ABC for claim forms as soon as possible after [the] disability occurs. [The applicant] and [his or her] doctor should complete and return the forms within 20 days after [the applicant's] disability begins, or soon as reasonably possible." (Anderson 014; *see also* Anderson 027 ("Claims should be filed within 20 days after the disability occurs or as soon as reasonably possible."), Anderson 048 (same).) Defendant further relies on provisions in the policy to demonstrate the time period for filing claims. (Defendant's Mot. at 5 (citing Aetna 598).) The policy provides that Defendant will not pay benefits until it is given a written proof of loss. (*See* Aetna 598.) The policy then provides under the section entitled "Proof of Loss" that:

1.  A request for Initial Application for Group Long-Term Disability (LTD) Benefits must be made to the Benefits Administrator (Section VII, number 11).

    This request should be made:

    a.  Within 20 days after a disability occurs; or

    b.  As soon as reasonably possible.

    If the covered individual does not receive the form within 15 days, he or she can meet the proof of loss requirement by giving Aetna a written statement of what happened. Aetna must receive a written statement within 90 days by not later than one year after the disability occurs (unless the applicant is not legally capable).

2.  The covered individual must complete and sign the form. Have the physician complete and sign his or her part.

3.  The covered individual must return the form to the Benefits Administrator (Section VII, number 11). The form is due within 90 days after the end of the Waiting Period (Section VII, number 30), and thereafter at least once each 90 days as long as the covered individual is disabled. If he or she does not send

8

**United States District Court**

For the Northern District of California

1    Aetna the form when due, Aetna will still honor the claim if he or she sends
Aetna the form as soon as reasonably possible.  The form must be sent to Aetna
2    not later than one year after it is otherwise required....

3    (Aetna 598.)  Defendant relies on this description to argue that claims are due, at the latest, "not

4    later than one year after the disability occurs."  However, this phase describes when the written

5    statement is due which may be provided by the applicant as proof of loss if he or she does not

6    receive the forms from the benefits administrator.  (*Id.*)   If the applicant makes the request and

7    receives the applicable forms, the policy provides that the form is due "90 days after the end of

8    the Waiting Period."  The policy then continues to provide that Defendant will still honor the

9    claim if the applicant fails to submit the form within this time period so long as the applicant

10   submits the form "as soon as reasonably possible" and sets one-year from the deadline (i.e. 90

11   days after the end of the Waiting Period) as the cutoff point.  (*Id.*)

12         At the hearing on the cross-motions for summary judgment, Defendant argued that

13   although there appears to be a conflict between the summary plan description and the policy as

14   to when the deadline to file a claim expires, the summary plan description is controlling.  The

15   Court disagrees. *See Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.,* 293 F.3d

16   1139, 1145 (9th Cir.2002) (holding that inconsistencies between the language of an ERISA

17   master plan document and a summary plan description must be resolved in the employee's

18   favor).  Because the policy and the summary plan description set forth conflicting deadlines, the

19   document more favorable to Plaintiff – the policy – controls.

20         Regardless of whether Plaintiff was disabled starting in early April 2002 and subject to a

21   one-year waiting period or was disabled starting at the end of December 2002 and subject to a

22   90-day waiting period, her waiting period would have expired by the end of March 2003.  The

23   final deadline for her to submit the forms for a long-term disability claim would have expired by

24   the end of June 2004, one year after the 90 days after the waiting period ended.  Plaintiff

25   submitted her claim in January 2004, which is before the final deadline expired.  (Aetna 382.)

26   Accordingly, Defendant has not shown that Plaintiff filed her claim late.  The Court thus denies

27   Defendant's motion on the grounds of notice-prejudice.

28

**CONCLUSION**

For the foregoing reasons, the Court denies the parties' cross-motions for summary judgment.  At the hearing on the parties' cross-motions, while Defendant made clear it had no objection to converting its summary judgment briefs into trial briefs and having the Court conduct a bench trial *de novo* based entirely on the administrative record, Plaintiff wanted the opportunity to submit trial briefs and reserved on whether she wanted to submit additional evidence for the Court's review.  Accordingly, the Court directs the parties to meet and confer regarding whether they intend to submit evidence beyond the administrative record and to establish a briefing schedule for submitting trial briefs.  If the parties intend to submit additional evidence, they should make a showing under *Mongeluzo*, 46 F.3d at 943-44, that the circumstances demonstrate that the additional evidence is necessary for the Court to conduct an adequate *de novo* review of the benefit decision.  The parties shall file a stipulation on these issues or, if unable to agree, a brief summary of the parties' respective positions, by no later than September 22.

**IT IS SO ORDERED.**

Dated: August 31, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE